IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 14, 2015 Session

## STATE OF TENNESSEE v. TRACY LYNN CARMAN-THACKER

**Appeal from the Circuit Court of Coffee County**
**No. 39310      Vanessa Jackson, Judge**

**No. M2014-00757-CCA-R3-CD - Filed April 24, 2015**

A Coffee County jury found the Defendant, Tracy Lynn Carman-Thacker, guilty of willful abuse, neglect, or exploitation and false imprisonment. The Defendant appeals, asserting that the trial court erred when it: (1) failed to compel the State to make an election of offenses; (2) denied the Defendant's motion for acquittal as to both charges; and (3) determined that the victim was competent to testify at trial. After a thorough review of the record and applicable law, we reverse and remand in part, and affirm in part.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court Reversed and Remand in Part, and Affirmed in Part**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Floyd Don Davis, Winchester, Tennessee, for the appellant, Tracy Lynn Carman-Thacker.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Charles Craig Northcott, District Attorney General; and Jeffrey D. Ridner, Assistant District Attorney General for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant's treatment of her intellectually disabled sister, Eileen Carman, the victim. A Coffee County grand jury indicted the Defendant for one count of willful abuse, neglect, or exploitation and two counts of aggravated kidnapping. The State later amended Count 2 of the indictment to a charge of false imprisonment and dismissed the other aggravated kidnapping charge.

At trial, the parties presented the following evidence: Agent Johnny Thomas, a Social Security Administration criminal investigator, testified that his primary duties with the Inspector General's Office were to investigate fraud, waste, and abuse of government funds. Agent Thomas recalled that he was notified by the Tullahoma Social Security office about a local news story involving the victim. Agent Thomas confirmed that the victim was eligible for disability benefits "as a result of her mental retardation." He stated that the victim had been receiving Social Security benefits on this basis since 1997.

Agent Thomas testified that, in the course of his investigation, he learned that the victim's sister, the Defendant, received the victim's Social Security benefits on her behalf as the victim's representative payee. Agent Thomas explained that a representative payee is "someone who's appointed by the Social Security Administration to be [the beneficiary's] monetary overseer . . . for their food, clothing, and shelter needs." He stated that the Social Security Administration first makes a determination that a person is "incapable of handling their own benefits" before appointing a representative payee. Agent Thomas said that the benefit money is only to be used for "food, clothing, and shelter needs" for the recipient and that the representative payee is not allowed to use the money for their own personal use. Agent Thomas explained that the Social Security benefits should be deposited into an individual account, not a joint account. In this case, the benefits should have been deposited into an account under the victim's name.

Agent Thomas testified that he obtained bank records and learned that the only bank account was in the name of the Defendant, with the victim having no ownership of the account, in violation of the policies governing representative payees. The Defendant became representative payee for the victim in January 2000, and, at that time, received a guide for representative payees that listed the duties and responsibilities of this role. Agent Thomas identified the guidelines provided to all representative payees. The guidelines stated that representative payees must use the beneficiary's money for "day-to-day" needs, such as food and shelter. Any remaining money after the "day-to-day" needs are met could then be used for the beneficiary's medical and dental health care expenses not covered by health insurance or for personal needs such as clothing or recreation. Thereafter, any remaining money must be saved, "preferably in an interest-bearing account or U.S. Savings Bonds." Further, the guidelines instruct that a representative payee is "not to take a fee from the beneficiary's funds" for services rendered as a representative payee. The guidelines also contained specific instruction on how the funds should be held.

Agent Thomas testified that, in the course of his investigation, he found that from December 2006 to December 2011, the Defendant received $68,301 in benefits on behalf of the victim. Agent Thomas stated that the Defendant's bank account balance as of November

2

30, 2011, was $119,456.48. Agent Thomas identified a Representative Payee Accounting Form sent out annually to verify the receipt and spending of the benefits. The verification form completed by the Defendant in September 2009, for the period from February 2007 through January 2008, indicated that the Defendant received $13,009 during this time period and spent $12,000 of this amount for the victim's food and housing. The form indicated that the Defendant spent the remaining $1,009 on "clothing, medical and dental expenses, education, recreation, or personal items" for the victim. No supporting documentation was required for these forms.

Agent Thomas identified a Representative Payee Accounting Form completed by the Defendant on February 4, 2010, for the time period from February 1, 2008, through January 31, 2009. The form indicated that the Defendant received $13,348 during this time period and spent $8,899 on food and housing for the victim and $4,449 for "clothing, medical and dental expenses, education, recreation, or personal items" for the victim. Agent Thomas stated that the verification forms for the two following years were not returned to the Social Security Administration. Agent Thomas stated that, according to his records, $14,052 was issued to the Defendant on the victim's behalf in 2009, $14,052 in 2010, and $14,052 in 2011.

On cross-examination, Agent Thomas stated that, although the Social Security Administration did not require representative payees to sign a document acknowledging receipt of the rules and regulations, it was "standard procedure" to provide representative payees with the guidelines. Agent Thomas agreed that he had "[n]o direct proof" that the Defendant did not use the benefits for the victim.

Debra Mooneyham testified that in December 2011 she worked for Adult Protective Services investigating accusations of elder abuse and financial exploitation. In the course of her job, she received a complaint involving the Defendant and the victim. Ms. Mooneyham conducted a home visit on December 5, 2011, to investigate the allegations. Ms. Mooneyham stated that the Defendant's property was located in Coffee County. She described the residence as a double-wide mobile home that had been "partially burned." She stated, "[a]ll of the windows had been blown out due to a fire, and the main residence was . . . in a country setting, a mobile home park type setting."

Initially, Ms. Mooneyham knocked on the front door, but, when she received no response, she walked around to the side and knocked on the side of the mobile home until she heard "a voice tell [her] to come in." She then proceeded around to the rear of the house through a gate with a "No Trespassing" sign, where she found a "small building almost like a utility shed" built onto the back porch of the mobile home. Ms. Mooneyham could hear a female voice from inside the shed but observed a "clasp and hook" on the outside door of

3

the shed. Ms. Mooneyham asked the person inside the shed if it was alright if she "undid the wire," and the person inside the shed responded, "[y]eah."

Ms. Mooneyham testified that, when she opened the door, she found the victim who appeared "very tattered, dirty" and with her hair matted. She stated that the victim smelled as if she had not showered or bathed in "quite some time." She estimated the dimensions of the room as "possibly 8 by 12" and described it as "small." Ms. Mooneyham said that the room was "filthy" and smelled of human waste. A toilet without a tank was in the room, but clearly not functioning properly because "there was human waste to the rim and overflowing." Ms. Mooneyham described the bedding as "filthy" and the clothing found in the room as "very dirty." Ms. Mooneyham stated that the weather was very cold the day of the home visit. She noted that there was a small electric heater in the room that did not provide sufficient heat. Other than an electrical cord that was brought in from the outside, there was no other apparent available source of electricity for the room. Ms. Mooneyham stated that there was no electrical light source or running water for the room. There were two "small, very worn puzzles" in the room and a television and a radio that did not work.

Ms. Mooneyham called the police and, after they arrived, she went and bought lunch for the victim. When she gave the food to the victim, the victim "smiled and then she ate it very fast." The victim was later transported to the hospital by ambulance to be evaluated for possible malnutrition or dehydration.

Ms. Mooneyham testified that she spoke with the Defendant in mid-December 2011. The Defendant told Ms. Mooneyham that the victim had been in the room for two days after the Defendant was unable to find care for the victim. The Defendant stated that she felt the victim "was better off there than in the street." The Defendant stated that she lived "right down the road" from the victim. The Defendant told Ms. Mooneyham that she received the victim's benefit checks and that she paid "her bills" with the money.

On cross-examination, Ms. Mooneyham agreed that there was a window in the room but clarified that the window was "very small" and one that would be "difficult" to get out of the room through. Ms. Mooneyham agreed that medical personnel at the hospital determined that the victim was not malnourished or dehydrated. She stated that the victim was not crying when she found her but was "panicked," "wanted out of the shed," and did not want Ms. Mooneyham to leave. Ms. Mooneyham agreed that the Defendant had told her that she was a nursing student and had tried to find someone "to watch" the victim. When she could not, she put the victim in the shed to keep her out of the road and safe from injury. She said that the victim's neighbors, Mr. and Mrs. Travis, had also told her that they "checked on" the victim periodically.

4

Erin Haggard, a Coffee County Sheriff's Department deputy, testified that she was the first to arrive at the scene. When she arrived, she met Ms. Mooneyham and the victim. She said the victim's clothing appeared to be "dingy" and "dirty," and the victim smelled of urine. Deputy Haggard entered the room where Ms. Mooneyham had discovered the victim and described the room as "very dirty." She described the toilet as located close to the bed and not functional. Deputy Haggard was unable to find any toilet paper in the room and the victim indicated that there was not any toilet paper available to her. She stated that there was a small space heater in the room with an electrical cord that ran outside the room to a power source. She found no food inside the room and very few personal items other than a puzzle, a notepad, and crayon. Deputy Haggard noted that the clothing in a laundry basket in the room also appeared to be dirty.

Deputy Haggard testified that she later spoke with the Defendant who stated that the trailer had burned down in June or July. As to her ability to care for the victim, the Defendant stated, "she had school all day, and she also ha[d] children to care for, and it's very hard, and she's unable to do it." The Defendant told Deputy Haggard that the victim had been locked in the room for two days for the victim's safety.

On cross-examination, Deputy Haggard agreed that the Defendant had stated that on several occasions the victim had been out in the road stopping cars to beg for cigarettes. On redirect examination, Deputy Haggard stated that the Defendant acknowledged that she received a disability check on the victim's behalf.

Daryl Welch testified that he was employed by the Coffee County Sheriff's Department in December 2011.[1] He recalled a dispatch requesting he assist Adult Protective Services in reference to a complaint investigation. Agent Welch described the location of the complaint as a mobile home that had caught on fire in June of 2011. A room was built on the back porch with a small walkway in between the wall of the room and the trailer. Based upon his inspection of the room, Agent Welch did not believe that there was a way to exit the room from the inside when the door was locked and wired from the outside as it had been when Ms. Mooneyham had arrived. Agent Welch described the inside of the room as "the most despicable and disgusting thing that [he had] seen in all [his] years of being a deputy sheriff."

Agent Welch testified that based upon his investigation he obtained warrants for the Defendant's arrest on the same day, December 5, 2011. The Defendant was arrested and provided a statement to police. She stated that she was unable to care for the victim. She

---

[1]At the time of the trial, Mr. Welch was serving as the deputy director for Homeland Security in Coffee County. We will refer to him as Agent Welch consistent with his position at the time of trial.

5

admitted to police that she used some of the victim's benefit money to pay her own bills. She said that she bought the puzzles and "some coloring books" for the victim with the benefit funds as well. Agent Welch recalled that the Defendant stated, "I'm guilty. . . . She's been locked in that room for two days." The Defendant explained that she locked the victim in the room to prevent her from "getting out in the road and picking up cigarette butts."

Agent Welch testified that the Defendant was interviewed again on the following day, December 6, 2011. The Defendant again stated that the victim had been locked in the room for two days and that the Defendant had used some of the victim's benefit money to pay for the Defendant's own bills.

The victim testified that the room where she was found did not have working lights, a working toilet, toilet paper or paper towels, or any food in it. When asked if she liked being in that room, she responded, "No, no, no, huh-uh." She stated that she wanted to get out of the room and was "glad" when the police officers took her out of the room.

On cross-examination, the victim agreed that she often flagged down cars in the street to ask for cigarettes. When asked if she wanted "to see the children," the victim responded that the Defendant told her she "can't see the kids no more" and that is why she did not want to see the Defendant.

Judy Reed testified on the Defendant's behalf. She stated that she was a retired registered nurse and attended church with the Defendant and the victim. Ms. Reed stated that she had been to the victim's home on multiple occasions. She said that the room the victim was found in was the victim's "normal bedroom," but she clarified that she had never gone into the victim's bedroom. She described the victim's appearance as "always clean" when she interacted with the victim.

Ms. Reed testified that, after the Defendant's arrest, she took pictures of the victim's bedroom. She described the room as approximately 9 feet by 13 feet with a 2 foot by 3 foot window. She said the door to the room also had "a partial window in it." She took pictures of a "new commode" and an "old commode" that were outside the victim's room on the porch.

Frankie Travis testified that he lived next door to the Defendant. He said that he saw the victim on a regular basis and that he and his wife "kind of watch[ed] for" the victim occasionally. He recalled that the victim would go out into the road to flag cars down and ask for cigarettes. When he observed the victim doing this, he would tell her to go back in the yard or sit on her porch. Mr. Travis said that the victim would "get agitated sometimes" when he would ask her to get out of the road. Mr. Travis said that he observed the victim

breaking windows and "tear[ing] up things in the yard and stuff like that."

Mr. Travis testified that he repaired "minor things" in the victim's residence at the Defendant's request. He said that on December 5, 2011, there was a plan to install a new toilet in the victim's room.

On cross-examination, Mr. Travis confirmed that after the June 2011 fire, "everybody quit living" in the trailer except for the victim. Mr. Travis confirmed that the water supply to the room was cut off when the toilet tank broke.

Jeanne Travis, Frankie Travis' wife, testified that she saw the victim on a daily basis and often the victim would go out in the road to try and stop vehicles. Ms. Travis said that the victim would stand in front of the cars causing her to "almost get hit." Ms. Travis said that she would tell the victim to go back in her yard. The victim would comply "sometimes" and would "get mad" when told to get out of the road. Ms. Travis stated that the victim was "usually" clean and properly dressed. Ms. Travis said that the Defendant asked her "to keep [her] eyes and ears open" with regard to the victim on December 5, 2011. Ms. Travis explained that she would not bring the victim into her home "[b]ecause [she] was afraid [the victim] would throw a temper and get mad." She said that on December 5, she twice walked "over in the driveway to make sure [the victim] wasn't doing anything or anything like that."

Ms. Travis testified that, on December 5, 2011, Ms. Mooneyham asked Ms. Travis if the trailer belonged to the Defendant. Ms. Travis confirmed that the trailer was the Defendant's and then watched Ms. Mooneyham approach the trailer. She said that Ms. Mooneyham did not go to the front door of the trailer and knock.

On cross-examination, Ms. Travis testified that, when the Defendant asked her "to look after" the victim, the Defendant did not provide any food or water for the victim. Ms. Travis stated that she did not actually go back to the room to check on the victim, she "just went to the driveway" to see if she could hear "anything."

Kenneth Harpe testified that he attended church with the Defendant and had known her seven or eight years. He confirmed that he had visited the Defendant in her home on six or eight occasions. He said that he also saw the victim at church functions and confirmed that the victim was clean and well-dressed on these occasions. He described the victim as "easy to upset." He recalled seeing the victim standing in the middle of the road stopping traffic.

Chris Renaud testified that he attended church with the Defendant. He described the victim as happy and "in high spirits," although on one occasion he had observed her cursing

7

at "Kenny." He had also observed the victim out in the roadway on at least three occasions.

Roger Walters testified that he was one of the Defendant's neighbors. Mr. Walters stated that he knew the victim and had observed the victim stopping traffic and asking for cigarettes.

Walter Hackney, Earlene Hackney, and Robin Gadd, all testified that they attended church with the Defendant. They all stated that they had seen the victim at church properly dressed and clean.

After hearing this evidence, the jury convicted the Defendant of willful abuse, neglect, or exploitation and false imprisonment. The trial court sentenced the Defendant to serve two years for the willful abuse, neglect, or exploitation conviction and a concurrent sentence of eleven months and twenty-nine days for the false imprisonment conviction. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal the Defendant asserts that the trial court erred when it: (1) failed to compel the State to make an election of offenses; (2) denied the Defendant's motion for acquittal as to both charges; and (3) determined that the victim was competent to testify at trial.

## A. Election of Offenses

The Defendant argues that, because the State did not make an election in Count 1, the jury verdict was not unanimous. The State concedes this issue, agreeing that the Defendant is entitled to a new trial on this count.

The Tennessee Supreme Court "has consistently held that the prosecution must elect the facts upon which it is relying to establish the charged offense if evidence is introduced at trial indicating that the defendant has committed multiple offenses against the victim." *State v. Johnson*, 53 S.W.3d 628, 630 (Tenn. 2001) (citing *State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001); *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997); *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996); *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993)). "The election requirement safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." *Johnson*, 53 S.W.3d at 631 (citing *Brown*, 992 S.W.2d at 391). A jury's verdict is not unanimous when the jurors find the same elements of a particular crime based on different facts and offenses; the jurors must "deliberate and render a verdict based on the same evidence." *Id*. "[T]here should be no

8

question that the unanimity of twelve jurors is required in criminal cases under our state constitution." *State v. Brown*, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991). The Tennessee Supreme Court explained that "[a] defendant's right to a unanimous jury before conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of creating a 'patchwork verdict' based on different offenses in evidence." *Kendrick*, 38 S.W.3d at 568 (quoting *Shelton*, 851 S.W.2d at 137). The Defendant's right to a unanimous jury verdict on each and every count is "fundamental, immediately touching the constitutional rights of the accused." *State v. Burlison*, 501 S.W.2d 801, 804 (Tenn. 1973).

In this case, the Defendant was indicted for abuse, neglect, or exploitation pursuant to Tennessee Code Annotated section 71-6-117. This statute provides, "[i]t is an offense for any person to knowingly, other than by accidental means, abuse, neglect or exploit any adult within the meaning of this part." T.C.A. § 71-6-117(a).

In this case the State did not make an election as to whether this offense was committed through abuse, neglect, or exploitation. The jury charge also does not specify the alleged criminal act nor does the jury verdict form. During deliberation, the jury asked whether it must find all three, abuse, neglect and exploitation, to convict the Defendant. The trial court responded, "[t]he answer is no. As long as you agree on one - either abuse, neglect or exploitation - you can find her guilty of that offense." The evidence in this case indicated various types of abuse, and the response by the trial court essentially left the jury to elect for itself the incidents on which to convict. As our Supreme Court reasoned in *State v. Shelton*, even if the jury agrees upon one of the options, the trial court and the reviewing appellate courts are unable to determine what the election was and whether the State had sufficiently proven its case. *Shelton*, 851 S.W.2d at 137. Therefore, we reverse the Defendant's conviction for willful abuse, neglect, or exploitation, and remand the case for a new trial on this count.

## B. Sufficiency of the Evidence

The Defendant asserts that there was insufficient evidence to support either of her convictions. Based upon our reversal of the conviction in Count 1, and the reason for that reversal, we address only the argument as to Count 2, false imprisonment. As to the false imprisonment conviction, the Defendant argues that she should not have been convicted of false imprisonment because "these measures" were taken to protect the victim. The State responds that a false imprisonment is not justified by a Defendant's good intentions and asks this Court to affirm the conviction.

When an accused challenges the sufficiency of the evidence, this Court's standard of

review is whether, after considering the evidence in the light most favorable to the State, "*any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.*" *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523,

10

527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

In this case, the State was required to prove that the Defendant "knowingly remove[d] or confine[d] another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302(a).

The evidence, viewed in the light most favorable to the State, showed that the Defendant locked the victim in a small room for two days with no electricity, light, running water, food, or a working toilet. When she was found, the victim was upset and fearful that she would be left again. She testified at trial that she did not want to be in the room and was "glad" when police officers took her out of the room. From this evidence, a jury could find that the Defendant knowingly confined the victim in violation of Tennessee Code Annotated section 39-13-302.

Accordingly, we conclude that the proof is sufficient to support the Defendant's conviction for false imprisonment beyond a reasonable doubt. The Defendant is not entitled to relief as to this issue.

### C. Admission of Victim's Testimony at Trial

The Defendant asserts that the trial court should not have allowed the victim to testify at trial. The Defendant contends that the victim's "mental abilities were so limited that her testimony had no probative value" and that the victim's emotional state while testifying caused him "unfair prejudice which substantially outweighed any probative value." The State responds that the Defendant has waived any argument that the victim's testimony was improper because she failed to raise a contemporaneous objection to the testimony at trial. We agree with the State.

In most cases, the failure to raise a contemporaneous objection to the admission of evidence at the time the evidence is introduced at trial results in waiver of the particular issue on appeal. *See* Tenn. R. App. 36(a); *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). The State claims that the Defendant never objected to the victim's testimony and that the Defendant had the opportunity to question the victim on cross-examination about the

victim wandering out into the street. Because the Defendant did not object to the victim's testimony offered by the State, the issue is waived. *See* Tenn. R. App. P. 36(a) (appellate relief is generally unavailable when a party "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error."); *State v. Schieffelbein*, 230 S.W.3d 88, 118 (Tenn. Crim. App. 2007) ("The failure to make a contemporaneous objection constitutes a waiver of the issue on appeal.").

Our Supreme Court has held that appellate courts are not precluded from reviewing issues under the plain error doctrine. *State v. Page*, 184 S.W.3d 223, 230 (Tenn. 2006). This Court may only consider an issue as plain error when all five of the following factors are met:

(1) the record must clearly establish what occurred in the trial court;

(2) a clear and unequivocal rule of law must have been breached;

(3) a substantial right of the accused must have been adversely affected;

(4) the accused did not waive the issue for tactical reasons; and

(5) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). Furthermore, the "plain error must be of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (internal quotations and citation omitted).

Under the plain error doctrine, the Defendant is not entitled to relief. The Defendant cannot establish that the decision not to raise an objection was not tactical. As the State points out, the Defendant obtained testimony from the victim that was favorable to her theory of defense. During cross-examination, the victim testified that she frequently wandered into the road and stopped traffic, confirming the Defendant's theory that the Defendant's conduct was necessary to protect the victim from harm. Accordingly, the Defendant is not entitled to relief as to this issue.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, we affirm the trial court's judgment, in part, reverse in part, and remand to the trial court for further proceedings consistent with this opinion.

_____
ROBERT W. WEDEMEYER, JUDGE